677 P.2d 594 (1984)
In the Matter of the ESTATE OF Walter E. HERRMANN, deceased;
Peter L. FLANGAS and John Tom Ross, Appellants,
v.
Ralph HERRMANN, Executor of the Estate of Walter E. Herrmann, deceased, Respondent.
No. 11154.
Supreme Court of Nevada.
January 23, 1984.
Rehearing Denied March 8, 1984.
*595 John E. Stone, Las Vegas, for appellants.
Woodburn, Wedge, Blakey & Jeppson, and Casey W. Vlautin, Reno, for respondent.

OPINION
PER CURIAM:
This appeal challenges an order of the Ninth Judicial District Court entered by Judge Howard McKibben, which purported to award appellant Peter L. Flangas and his co-counsel John Tom Ross the sum of $6,000 as attorneys' fees for services rendered in the Estate of Walter Herrmann, instead of the sum of $70,000 which Judge Richard Waters had previously awarded to them by a judgment duly and lawfully entered.[1] Because Judge McKibben lacked jurisdiction to ignore the final judgment that Judge Waters had rendered with complete propriety, we reverse the order entered by Judge McKibben.

THE FACTS
In this case, governing legal principles become quite obvious once the relevant facts are adequately understood. However, comprehending those facts requires review of a rather extended procedural history leading to entry of conflicting orders by Judge Waters and Judge McKibben.

Events Leading to Judge Waters' Award
At the time Walter Herrmann died of cancer on January 20, 1973, he and his wife *596 Fern Herrmann owned substantial community property, including real estate in California and in Washoe County and Lyon County, Nevada. One real property holding that figures somewhat prominently in this litigation was a valuable ranch of 2,478 acres in Lyon County, which is adjacent to the Carson River, and which enjoys valuable rights to use waters from said stream.
Shortly before his death, Walter Herrmann undertook to provide for the disposition of his share of the community properties. To that end, he caused Carson City attorney Carl Martillaro, who had been representing him in matters related to development of the Lyon County ranch, to prepare a last Will for his execution. The Will named Walter Herrmann's son, respondent Ralph Herrmann, as his executor, and it designated the following beneficiaries and disposition of property:
(1) To his widow, Fern, Herrmann left a specific bequest of "any interest I may have in all household furniture, furnishings and fixtures, jewelry, china, silverware, books, pictures, clothing, and all other items of domestic, household or personal use, and all automobiles which at the time of my death shall be in, about, or used in connection with my home."
(2) To his daughters, Mary Louise Franklin, Ruth Fern Estep, and Ethel May Colthern, Herrmann left specific bequests of $20,000.00 each.
(3) To his son, respondent Ralph Herrmann, Walter Herrmann left all of the residue of his estate.[2]
On March 7, 1973, pursuant to petition of respondent Herrmann, the decedent's Will was duly admitted to probate by the Honorable Richard Waters of the First Judicial District, which then encompassed Lyon County. At the same hearing  Mary Louise Franklin, Ruth Fern Estep, and Ethel May Colthern being non-residents  Judge Waters appointed appellant Flangas as their counsel pursuant to NRS 136.200. Subsequently, on March 20, 1973, Judge Waters appointed appellant Ross as co-counsel to Mr. Flangas. It appears of record that Mr. Flangas and Mr. Ross had special qualifications, known to Judge Waters, which had application to a matter of vital importance to the Estate of Herrmann, to-wit: the subdivision and development of the Lyon County ranch for residential housing purposes.
Prior to his death, Walter Herrmann had undertaken extensive preparations for the development of the Lyon County ranch. Inter alia, he had made substantial expenditures to preserve a State grant of water rights by building a dam and placing land under irrigated cultivation. A master plan had been prepared, contemplating that the entire ranch ultimately would be subdivided, embracing an airport, some small lakes suitable to be stocked with game fish, and a golfcourse designed by the firm of Robert Trent Jones, a nationally renowned golfcourse architect. The planned first phase of this project was a subdivision consisting of some 142 lots, on 161 acres of the Lyon County ranch. At the time of his death, however, all of the decedent's plans and expectations were threatened by actions of officials in Lyon County, purporting to impose a moratorium on subdivision development in the area of the Herrmann ranch.
Appellant Flangas previously had served as District Attorney in Lyon County, and, therefore, was well acquainted with zoning procedures in that county and also with various public officials who were charged with application of those procedures. Indeed, the record indicates Flangas had drafted at least one of the very ordinances on which contentions of the parties concerning the moratorium were expected to center. Appellant Ross formerly had served as District Attorney of Carson City, *597 and, as such, had become well experienced in zoning procedures and disputes. Since leaving public office, it appears Ross had concentrated his professional and business activities principally in the areas of construction and real estate development.
After their appointment, Flangas and Ross participated in the eventual efforts which culminated in approval of the proposed initial subdivision of 161 acres. When negotiations with officials and administrative proceedings ultimately proved unavailing, a mandamus action was instituted in the First Judicial District Court, for Lyon County, to compel the county commissioners to file the subdivision map.
It stands uncontroverted that Ross did the legal research for this lawsuit, and assisted in the trial with respondent Herrmann's counsel, Martillaro, while Flangas was also present. It also appears that, following a judgment by Judge Waters favoring the Herrmann Estate, Lyon County initiated an appeal to the Supreme Court of Nevada. Again, it is uncontroverted that counsel for the non-resident heirs aided respondent Herrmann's counsel in defeating the county's appeal. It appears Ross developed the strategy of seeking a hearing to compel a large bond to secure against extreme monetary damages that arguably would result from construction delays. Ultimately, following these further court proceedings before Judge Waters, Lyon County conceded defeat and withdrew its appeal, and the Estate of Herrmann thus gained full approval for the initial subdivision of 161 acres.
The record is replete with evidence that the efforts of Flangas and Ross were not limited to participation in this critical zoning litigation. Flangas and Ross were active in resolving other important concerns of the Estate. Although respondent Herrmann now contends that their activities had no value, they made trips to California in regard to the California probate proceedings and tax concerns. Indeed, it even appears that, when respondent Herrmann was preparing to account to Judge Waters for his administration of the Estate, Martillaro was otherwise occupied, and Herrmann therefore collaborated with a Mr. Ken Poole, who was Flangas' professional associate and employee.
Apparently, by this time, respondent Herrmann had developed some antipathy toward Ross, even though he acknowledges having traveled to California on Estate business with Ross on more than one occasion, and having discussed Estate business almost daily with him and Martillaro in Carson City, and also in Las Vegas. In any case, Herrmann instructed Martillaro that he did not want his First and Final Account and Petition for Distribution to mention Ross, and, in the final form filed with court, the petition therefore referred only to Mr. Flangas and not to co-counsel Ross. Nonetheless, the petition, which Herrmann verified under oath, referred to the Lyon County mandamus action that Ross had successfully prosecuted with Martillaro, and went on to allege: "Peter L. Flangas has performed ordinary services for the absent heirs, and has participated in matters of substantial benefit to the estate, and he is entitled to such compensation as the court finds proper." (Emphasis added.) The petition evinced a clear understanding that all fees for services performed by counsel for the non-resident heirs should be paid out of the general estate, and not by the non-resident heirs; for it went on to pray for an order: "Directing the Executor to pay all outstanding costs of administration, including attorney's fees of Carl F. Martillaro, and Peter L. Flangas." Herrmann also prayed for an order: "Directing the Executor to pay the cash legacies of $20,000.00 each to Mary Louise Franklin, Ruth Fern Estep, and Ethel May Coulthern." Thus, it is manifest from Herrmann's verified petition that he and his attorney knew and conceded that counsel for the non-resident heirs had not only performed routine services for the three non-resident heirs, but also extraordinary services for the estate. Further, it is clear that Herrmann and Martillaro knew all fees would be paid from the general estate, which had been benefited, and of which respondent Herrmann was to be the sole distributee. In sum, the petition recognized *598 quite explicitly that the compensation of counsel for the non-resident heirs (1) should be commensurate with their substantial efforts, but (2) should not be paid from the modest specific bequests to the non-resident heirs, to which adequate fees might necessarily be disproportionate and would be largely unrelated.[3]
Upon receipt of respondent Herrmann's First and Final Account and Petition for Distribution, Flangas advised his non-resident clients that the executor did not contemplate seeking to have Judge Waters assess any attorneys' fees against their bequests  that he therefore expected their entire bequests would be ordered distributed to them  and the decedent's daughters did not object, did not attend the distribution hearing, and evidently were content.[4]
On November 29, 1973, Herrmann and his counsel, Martillaro, appeared in court before Judge Waters in Lyon County, for the purpose of having their aforementioned petition heard and having issues raised thereby resolved. It appears that, either at the outset of or during the hearing, Martillaro submitted to Judge Waters a proposed order, which he had prepared earlier for the Judge's consideration, leaving blanks for the Judge to make entries when he decided how much to award to the executor and the attorneys. In accord with Herrmann's desires, before coming to court Martillaro had revised the proposed order, so that it would refer only to an "attorney"  rather than to "attorneys"  for the non-resident heirs. This, evidently, constituted an effort by respondent Herrmann to slight Ross. The court's minutes reflect, however, that both Flangas and Ross appeared in court and were recognized by the court as attorneys for the non-resident heirs. The record establishes that Judge Waters complimented all counsel on their performance. Additionally, the minutes reflect that Judge Waters took judicial notice that the appeal from his ruling in the zoning action had been successfully concluded, as had other litigation, and he expressly declared that the attorneys for the non-resident heirs had performed both ordinary and extraordinary services.
Judge Waters quite evidently gave some reflection to the amount of fees earned by Flangas and Ross; for in completing the proposed order submitted to him by respondent Herrmann's counsel, Judge Waters first wrote in the figure of $65,000 and then changed that sum to $70,000. He also added an "s" to the word "attorney" in the portion of the proposed order that related to fees for the non-resident heirs' counsel. He initialed these changes, signed the order, and announced his determinations. As articulated through the completed form of the order which had been proposed by Martillaro, *599 Judge Waters ruled: "The Executor shall pay from the assets of the Estate, and not as a charge against the non-resident heirs, one fee in the sum of $70,000.00 to the attorneys for the absent heirs, for ordinary and extraordinary services performed for the benefit of the Estate and the absent heirs, plus the sum of $1,500.00 advanced for expenses." (Emphasis added.)[5]
No objections whatever were noted by respondent Herrmann or his counsel, Martillaro. It appears that, at the conclusion of the hearing, the formal order as completed and executed by Judge Waters was thereupon delivered to the court clerk, who file-stamped it, and who also file-stamped and returned conformed copies of the final order to respondent Herrmann's counsel. Following the hearing, respondent Herrmann and all counsel left the courthouse and proceeded down the main street of Yerington to a restaurant, where Herrmann for the first time made it known that he was displeased by Judge Waters' order. Within days thereafter, on December 10, 1973, Judge Waters died; a successor was appointed and took office January 2, 1974.

Events Between Judge Waters' Award and the "Motion to Alter or Amend"

When Herrmann expressed discontent over Judge Waters' award to Flangas and Ross, it does not appear the attorneys were intractable. The record reflects that after negotiations, Flangas executed and delivered to respondent's attorney, Martillaro, a letter reciting as follows:
 December 5, 1973
Carl Martillaro
Attorney at Law
308 North Curry
Carson City, Nevada
 Re: Herrmann Estate
Dear Carl:
This is to inform you that the absent heir attorney
fee in the above entitled estate will be discounted
to the sum of $25,000.00 if paid on or before the
20th day of December, 1973.
 April 1974
 P.L.F.
 Sincerely,
 Peter L. Flangas
 PETER L. FLANGAS
As this document shows, Flangas initially agreed to discount the awarded fee to $25,000, if it was paid on or before December 20, 1973. Later, as a result of further negotiations, Flangas amended the letter agreement in hand-writing, by striking the words "December" and "1973," substituting the words "April" and "1974," and initialing the changes. (The handwritten entries are reflected in italics, above.) Then, believing the amended letter to be worthy of official memorialization, Martillaro or Herrmann caused it to be filed in the Herrmann Estate proceeding on December 26, 1973. It is on record there, file-stamped December 26, 1973, by the Deputy Clerk, Kathryn Sheehy.
April 20, 1974, came and went, and Herrmann failed to pay Flangas and Ross $25,000 or, indeed, anything at all.[6] He failed to pay other Estate creditors. Indeed, although respondent Herrmann found sufficient liquid assets to finance sprees of drinking and high-stakes gambling, he paid his sisters nothing on their specific bequests.[7]
*600 Even after Mr. Herrmann failed to pay Flangas the discounted sum of $25,000 by the negotiated deadline of April 20, 1974, Flangas and Ross did not press him aggressively on their own behalf. It appears, however, that the decedent's daughters pressed Flangas both by telephone and by letter to expedite payment of their bequests.[8] Informal demands on Herrmann and his attorney proved futile. Accordingly, on May 16, 1974, Flangas filed a petition which recited Herrmann's failure to pay the special bequests to the sisters, and Flangas asked the court to protect his clients by an order directing Herrmann to show cause why he should not be removed, or why sanctions should not be imposed. At this point in time, Flangas requested no relief whatever on behalf of himself and Ross.[9]
Judge Waters' successor entered an order to show cause, which Flangas had submitted to him, directing Herrmann to appear in court on July 3, 1974, and to explain why sanctions should not be imposed. The record indicates that when Herrmann appeared, he did not contend that he was ignorant of Judge Waters' order, or that Judge Waters' order was otherwise unenforceable. Rather, he sought to excuse his non-performance by claiming he lacked available cash. Thereupon, Judge Waters' successor granted Flangas and Ross leave to file another petition after six months if Herrmann remained in default of his duties. Herrmann did remain in default, failing either to pay the cash legacies to the nonresident heirs, or to pay the fees and costs of administration encompassed by Judge Waters' order. Accordingly, when six months had elapsed, Flangas and Ross filed a petition to compel distribution and pay fees, on February 12, 1975. It was out of these proceedings, initiated by Flangas and Ross, that attempts to impeach Judge Waters' judgment in their favor eventually evolved.
On February 12, 1975, Judge Waters' successor entered an order directing respondent Herrmann to appear in court on February 26, 1975, to show cause why he "should not forthwith obey that certain Order of this Court entered November 29, 1973, by distributing the assets of the estate of Walter E. Herrmann, deceased to the legatees and paying the fees ordered." The matter at issue, i.e., how to rectify Herrmann's defaults under the terms of Judge Waters' order, was not resolved on that date, however. It apparently was established on February 26 that, in addition to failing to pay the special bequests, fees and other debts, Herrmann was remiss in regard to various matters, such as filing accounts. Therefore, Judge Waters' successor ordered respondent Herrmann to render an accounting to the court on March 26, 1975, together with a liquidation plan as an addendum. The successor judge also continued until March 26 the hearing on the petition of Flangas and Ross to compel distribution and pay fees.
When Herrmann and his counsel appeared on March 26, they attempted to suggest that Judge Waters' award of fees had been compromised by agreement down to the sum of $25,000. Somewhat inconsistently, they also attempted to re-shape the hearing from one initiated to consider *601 Herrmann's defaults into one challenging the validity of Judge Waters' award of fees. Judge Waters' successor repeatedly repulsed such efforts, stating inter alia: "The Executor could have appealed Judge Waters' determination of fees back in 1973. The appeal time has run, and you are attempting to, in effect, go behind a judgment, Mr. Martillaro." Later, while examining Mr. Flangas as a witness, Mr. Martillaro once more attempted to question the value of his services. Again, Judge Waters' successor stated: "The Trial Court has done everything that it was required to do through Judge Waters, that is in settling the issues. From there you would go to the Supreme Court. This court has acted."
Subsequently, on April 11, 1975, Martillaro filed a document entitled "Motion to Amend or Alter the Order of November 29, 1973." By its terms, this motion was not filed on behalf of Ralph Herrmann, but instead was purportedly filed on behalf of Ruth Fern Estep and Fern Herrmann. Notably, however, no substitution of attorneys designating Martillaro as counsel for Estep or the other non-resident heirs, in place of Flangas and Ross, was ever filed  even though NRS 155.140 explicitly imposed on Flangas and Ross continuing status as counsel for the non-resident heirs.
The record does not reveal why Mr. Martillaro purported to proceed on behalf of persons other than his own client, Ralph Herrmann. Whatever the reason may have been, his motion invoked the names of surrogate movants, and it was but sparsely supported by legal citations. The attached brief of "Points and Authorities" consisted only of references to NRCP Rule 52(b); NRAP Rule 4; In Re Hansen's Estate, 50 Nev. 16, 248 P. 891 (1926); and Bowman v. Bowman, 27 Nev. 413, 76 P. 634 (1904). Later in this opinion, we will critique such "authorities"  which are distinctly not controlling. Reply points and authorities were duly filed on behalf of Flangas and Ross, citing cases we will also review later.
Events After the "Motion to Alter or Amend," Culminating in the Disqualification of the Successor Judge and in Judge McKibben's Assumption of Jurisdiction
The successor judge did nothing reflected by the official court file for some 4½ months.[10] Then, on August 27, 1975, he entered a "Memorandum of Decision and Orders," which declared:
The following matters, but not limited thereto, should appropriately be reviewed and, where and if applicable, be reconsidered: (1) All attorneys fees, in light of the time and hours, travel, expenses, manners in which the Estate may have benefitted [sic] from the services rendered, and what ordinary and extraordinary services might have been rendered by respective counsel; (2) the Executors [sic] fee in light of his services rendered in detail, with reference to any ordinary and extraordinary services rendered; (3) the matter of the Federal Estate Taxes; (4) the matter of the satisfaction of the legacies; (5) the status of the several law suits pending; (6) the payment of the Appraisers, and any other expenses of the Estate, perhaps not herein specifically referred to; (7) the status and disposition of the Testimentary Trust; and (8) the status of any credits or debits or liabilities of the Estate.
The document then concluded with a purported order, which recited, inter alia:
That all counsel and the Executor will file with the Clerk of the Court within twenty (20) days from the date hereof separate Petitions for Compensation and Cost Reimbursement. In addition to setting forth the amount which the Court is requested to allow, the Petition(s) shall contain by attachment or otherwise, specific *602 and detailed information supporting the entitlement for such amount, including time and hours, dates of rendition of services, the nature of services rendered, results achieved which have directly benefitted [sic] the Estate, (or client  see NRS 150.060(3), and such other information considered to be relevant and material to the question of compensation and cost reimbursement.
Flangas and Ross challenged such order by a petition to this court, seeking a writ of prohibition, which we denied on the ground that our intervention by way of extraordinary writ was unwarranted. A denial so grounded is never treated as an adjudication on the merits, but constitutes merely a determination that propriety of the questioned action can await review by appeal, in the ordinary course. However, the successor judge treated our order as one to be implemented by even broader orders of his own, and on December 17, 1975, he proceeded to file a document entitled "Orders Incidental to Supreme Court's Denial of Writ of Prohibition." Therein, inter alia, he directed as follows:
IT IS HEREBY ORDERED that Executor's counsel CARL F. MARTILLARO, ESQ., and co-counsel for absent heirs JOHN TOM ROSS, ESQ., and PETER L. FLANGAS, ESQ., file with the Clerk of the Court within thirty (30) days from the date hereof separate petitions for compensation and cost reimbursement, the same to be verified. In addition to setting forth the amount which the Court is requested to allow in each instance (including, if applicable, an allegation of the amount of any statutory fees or compensation) the Petitioner shall also contain by attachment or otherwise specific and detailed information supporting the entitlement to such amount, including reference to time and hours, dates of rendition of services, the nature and extent of such services rendered, any claimed extraordinary services, the complicated nature of the work required, and the benefits derived by the estate or beneficiary(s), as applicable; shall make specific reference to results achieved which have directly benefited the estate (or client) and shall further set forth such other information considered to be relevant and material to the application or petition for fees or commissions and costs reimbursement.
It should be noted, inter alia, that the two ex parte proclamations just mentioned apparently undertook to sweep aside Judge Waters' order as to fees entirely, without either notice or hearing, and to direct Flangas and Ross to file a highly detailed, verified petition for an entirely new award. This Flangas and Ross have consistently declined to do, contending instead that the successor judge lacked jurisdiction to impose such demands upon them. On February 17, 1976, they filed a "Response of Attorneys for Absent Heirs," wherein they advised the successor judge that they had not maintained time records, and that they therefore had gone back through their files attempting to reconstruct "the general time" spent in working on this estate. Because no time records had been maintained, work was indicated in terms of days on which they believed they had worked, rather than hours of work. They said they would assume an average of eight hours per day. They noted that, based on this reconstruction, they believed the time justified $210,000 in fees, if $75 were adopted as a reasonable hourly rate. They did not, however, ask the court to award them any fees based on this reconstruction. Rather, they contended the court was without jurisdiction to alter their fees of $70,000 and urged that "the fees as previously awarded should be acknowledged, affirmed and ordered."[11]
*603 On April 19, 1976, the successor judge responded with a "Memorandum and Orders Appointing Special Master," wherein he noted dissatisfaction with the responses of Flangas and Ross, and went on to name a Reno attorney as a "special master," ostensibly vesting said attorney with wide-ranging inquisitorial powers. In addition to instructing the "master" to inquire into all of the matters mentioned in his prior ex parte orders, the successor judge even directed a probe into other matters such as the decedent's domiciliary intent. Then, on June 28, 1976, Judge Waters' successor entered another ex parte order, purporting to remove Flangas and Ross without notice, and to appoint yet another Reno attorney to represent the non-resident heirs. This order recited in part:
THOMAS R.C. WILSON III, ESQ., is ordered to proceed in this matter in terms of preparation for the special master's proceedings with due diligence and to forthwith contact and be in touch with all said absent heirs with a view to adequately protecting the interests of said absent heirs in all respects in these and any related proceedings.
Although preparations for a hearing before the "special master" consumed several months, only their culmination is important to understanding the factual background of this appeal. After Ross and Flangas took the deposition of James Sims on November 29, 1976, the successor judge yielded to demands by Flangas and Ross, and disqualified himself on December 6, 1976. His order of withdrawal began by noting that he had presided in a substantial number of various and sundry criminal, as well as civil proceedings, and that he had presided in a manner considered to be with the utmost impartiality. He went on to emphasize that he was disqualifying himself voluntarily, in order to allow the attorneys and executor to have the feeling that they were, without question, having and enjoying a full and fair trial. He concluded by stating:
IT IS HEREBY ORDERED that ..., District Judge, does hereby remove himself from the above-entitled proceeding for the reasons above-stated.
IT IS HEREBY FURTHER ORDERED that the Honorable Peter I. Breen, District Judge of Department 7 of the Second Judicial District Court of the State of Nevada, in and for the County of Washoe, is hereby appointed to preside in the above-entitled proceedings in the place and stead of the undersigned Judge.[12]
Upon challenge for bias, Judge Breen also ultimately capitulated and disqualified himself; however, in the meantime, Judge Breen had discharged the special master, indicating that he intended to preside personally over the inquiry ordered by Judge Waters' successor.
By the time Judge Breen was forced off the case, Judge Waters' successor had been named to a seat on another court, and had himself been succeeded on the bench of the First Judicial District by Judge McKibben. Upon Judge Breen's disqualification, Judge McKibben therefore assumed jurisdiction of the case.

The Pre-trial Conference and Trial Before Judge McKibben
On November 22, 1977, Judge McKibben convened a pretrial conference to discuss what issues should be heard, and how they should be heard, in order to resolve contentions previously generated by and before Judge Waters' successor. Flangas appeared with John Stone as his counsel; Ross, with Drake DeLanoy. The executor, Ralph Herrmann, appeared with Casey Vlautin, who had been substituted as his attorney in place of Martillaro. Thomas R.C. Wilson, III, appeared as the court-designated attorney for absent heirs Estep, Franklin and Coulthern, who did not personally attend. (The absent heirs already had been paid their special legacies.) Fern *604 Herrmann did not appear, either personally or through counsel.
As the conference proceeded, it was established that, despite elaborate pre-trial investigation, Mr. Vlautin and Mr. Wilson had found no credible evidence to justify the successor judge's suspicions that Walter Herrmann had been induced to execute his probated last Will as a result of undue influence applied through a corrupt conspiracy. In fact, Mr. Wilson acknowledged, it would not even have been in the interest of the non-resident heirs to contend such a thing. They were pleased with the probated Will. As Mr. Wilson observed: "The prior Will would not have given the absent heirs anything."
Furthermore, it was admitted that there had been no justification for the successor judge's fears that Walter Herrmann had not truly been a domiciliary of Nevada, but of California, and that the counsel initially serving in the Estate of Herrmann had corruptly conspired to assert a fraudulent domicile here. As Mr. Vlautin summed up this issue:
I don't think anybody really had a problem with the domicile of the decedent with the exception of [the successor judge]. The absent heirs, apparently, don't. The Executor doesn't. There was real property held by the Estate in both States. Therefore, probate had to occur in both States... .
Various other issues raised by the successor judge likewise were eliminated from concern. The executor, Herrmann, removed the fees Judge Waters had awarded to him from contention, by waiving them. Again, the issue concerning the value of the executor's services, which the successor judge had raised sua sponte, had little practical consequence; for the Will constituted Ralph Herrmann the sole trustee and recipient of the trust corpus.
Thus, issues left for trial ultimately resolved principally to those related to attorneys' fees. Even though Ralph Herrmann was in accord with Martillaro as to the amount of his fees, Judge McKibben decided to go into this question anyhow.[13] The fees of Flangas and Ross were challenged by Vlautin and Wilson as unreasonable, and Judge McKibben identified them to be subjects of the trial. In doing so, Judge McKibben explicitly recognized that serious legal doubts existed concerning his own jurisdiction to proceed, stating:
I am sure at some point in time, depending upon what the Ruling of this Court would be after a Hearing, the Supreme Court will ultimately review this question including the question of whether or not a District Judge has the right to review an earlier Order of another District Judge with respect to the payment of fees. I don't suggest that you haven't reserved your rights to raise that at any point in time, but I would suggest that I do intend to go ahead with the Hearing ...
Before concluding the pre-trial conference, Judge McKibben expressed uncertainty about what kind of a proceeding the successor judge's orders had placed before him. "It's a different kind of proceeding," he said. "There's no doubt about it. This is not the usual type of adversary proceeding." In connection with these comments, Judge McKibben decided the burden of proof should be on Mr. Vlautin, as counsel for the Estate:
I am going to expect the Estate to proceed first. The way I view this case, there is an existing Order of Judge Waters setting fees. That Order as far as my mind is concerned right now is a valid Order until it's established that it is not a valid Order.
... I do think as long as there is an Order that there must be some presumption that the Judge knew what he was doing at the time he entered the Order. There should be some obligation on somebody to come in and show that is not proper.
*605 This, then, was the basis on which Judge McKibben explicitly ruled that trial should proceed: the executor, Herrmann, would be permitted to challenge Judge Waters' order of fees to Flangas and Ross; however, the burden would be upon him to show that Judge Waters' order was insupportable. Whether the executor would be obliged to carry that burden by "clear and convincing" evidence or by a "preponderance" of evidence was not then clarified. Indeed, even during trial, Judge McKibben continued to puzzle openly over what standard should be applied in deciding whether or not the executor had carried his burden of proof in this admittedly "different kind of proceeding."
The trial commenced on February 13, 1978. Upon opening court, Judge McKibben announced that the trial was proceeding under the order of the successor judge, "pursuant to a Motion to Amend Order dated April 11, 1975, challenging the order and decree of distribution entered November 19 [sic], 1973, by the late Judge Waters." Under Judge McKibben's announced interpretation of that motion, in which the parties present and their counsel all acquiesced, the executor, Ralph Herrmann, was recognized to be "the moving party in this matter." Accordingly, Judge McKibben directed Mr. Vlautin, Ralph Herrmann's counsel, to proceed.[14]
Although Vlautin and Wilson attempted to disprove it, at trial Flangas and Ross adduced considerable evidence to establish that Judge Waters' award of fees had been supportable. For example, DR 2-106 of the A.B.A. Code of Professional Responsibility, which Supreme Court Rule 203 adopted by reference in 1971, recites that one factor to be considered, in determining a just fee, is the "amount involved and the results obtained." Flangas and Ross produced two admittedly well qualified real estate appraisers, who testified that the zoning change effected through the attorneys' efforts had dramatically enhanced the value of the Lyon County ranch. Indeed, even an appraiser hired by Wilson acknowledged that the ranch's value had been substantially increased; however, utilizing a different appraisal technique, Wilson's expert contended for a smaller increment in value. In making his ruling, of course, Judge Waters had been entitled to take judicial notice of the zoning litigation, and of its impact on the financial condition of the Herrmann Estate as known to him. See, e.g., In Re Pailhe's Estate, 114 Cal. App.2d 658, 251 P.2d 76, 79 (1952). And, as the finder of fact, Judge Waters had been free to draw any rational inferences, including those mentioned by the experts who testified for Flangas and Ross. Thus, in short, the trial before Judge McKibben showed that it had been justified for Judge Waters to determine that, because of the "amount involved and the results obtained," Flangas and Ross should receive a larger fee than might otherwise have been warranted solely on the basis of time expended.
In arriving at a just fee, DR 2-106 also states that the "fee customarily charged in the locality for similar legal services" should be considered. Flangas and Ross introduced the testimony of two respected local attorneys, one of whom is now a district judge, evidencing that Judge Waters' award was consistent with then prevailing custom in the area. DR 2-106 further recognizes that an attorney's special experience or skill should be taken into account; and the record shows that, at least for the unique concerns of the Herrmann Estate, Flangas and Ross possessed special credentials which Judge Waters properly could and evidently did consider. Additionally, according to DR 2-106, other factors  e.g. the prospect of uncertain or delayed payment, and the fact that their *606 employment was not for an established and constant client  were proper for Judge Waters to weigh in their favor when deciding what fee to award Flangas and Ross.
Moreover, Nevada law specifically provides that a judge, in making an award to attorneys for non-resident heirs, may consider the value of their services to the general estate, and may award fees from the general estate, so that the legacies to the absent heirs are not affected. See NRS 150.060. This Judge Waters had done, at the express request of respondent Herrmann.
In sum, the trial established that substantial evidence was available to justify Judge Waters' award, but Judge McKibben nevertheless endeavored to award Flangas and Ross only $6,000, instead of $70,000 as previously ordered by Judge Waters. In reaching this result, Judge McKibben's approach to weighing and analyzing the evidence directly contradicted the central principles on which he had directed trial to proceed. In the order setting forth his own ruling, filed March 17, 1978, Judge McKibben for the first time announced the view that Judge Waters' order was entitled to no recognition, and that Judge McKibben was entirely free to consider the matter de novo. As Judge McKibben articulated his revised viewpoint:
the burden is on the attorney to prove, by preponderance of the evidence, both the services rendered, and the reasonable value thereof. See Kimball v. Pub. Ut. Dis. # 1 of Douglas Cty., 64 Wash.2d 252, 391 P.2d 205 (1964). The court therefore believes that it was incumbent upon both the attorneys for the absent heirs [Flangas and Ross] and the attorney for the Executor [Martillaro] to establish by a preponderance of the evidence to this Court the reasonableness of the value of the services rendered to the estate.[15]
Obviously, Judge McKibben's belated switch in perspective was an important event in the history of this litigation. It not only may have undercut the manner in which appellants presented their case, but also drastically altered the ways in which evidence actually adduced could be viewed. If Judge McKibben had truly possessed jurisdiction to reconsider the issue of fees, it would make a great deal of difference whether he properly could consider that issue de novo, rather than according to Judge Waters' decision a presumption of validity. As it occurs, however, we need not address such concerns because, in the facts of this case, we believe Judge McKibben had no jurisdiction whatever to interfere with, or to ignore, Judge Waters' order.

THE APPLICABLE LAW
1. Some serious issues in this case that need not be decided, but that should be noted, concern whether the so-called "Motion to Amend or Alter the Order of November 29, 1973," which was filed by Ralph Herrmann's counsel on April 11, 1975, was even judicially cognizable in form. Among these are questions arising because, although the "motion" purported to be made pursuant to NRCP Rule 52(b), it sought relief outside the normal purview of that rule;[16] and because Ralph Herrmann's *607 counsel tendered the ostensible "motion" in the names of Fern Herrmann and Ruth Estep Herrmann, whom he apparently did not represent then or thereafter.
For purposes of this opinion, we will accept the "motion" as Ralph Herrmann's, inasmuch as Judge McKibben ultimately did so, and inasmuch as Ralph Herrmann appears to have been the only party who eventually laid claim to it. We also will by-pass other deficiencies in the "motion" itself, as alluded to above. Nonetheless, we do not wish to be understood as endorsing the document as an example of acceptable motion practice, and we especially do not wish to suggest that NRCP Rule 52(b) is the proper rule to invoke when seeking a re-trial or a re-hearing.
2. Assuming, then, that the "motion" filed on April 11, 1975, was Ralph Herrmann's, that it was in adequate form, and that the relief it sought was available under NRCP 52(b), the question remains: Was said "motion" timely filed?
NRS 155.190 explicitly directs that an appeal may be taken "within 30 days after its entry" from any order or decree mentioned therein, including any "[d]irecting or allowing the payment of a debt, claim, legacy or attorney's fee." (Emphasis added.) And this court has specifically held that unless appeal is taken within 30 days, an order of the kinds mentioned in NRS 155.190 is not thereafter subject to attack. Luria v. Zucker, 87 Nev. 471, 488 P.2d 1159 (1971). Thus, it appears obvious from the probate code itself that the time for respondent Herrmann to challenge Judge Waters' order, either by appeal or otherwise, had expired many months before the "motion" was filed.
Nonetheless, respondent Herrmann has adopted the stance that the words "within 30 days after its entry" in NRS 155.190, which governs probate proceedings, should be construed in conformity with NRAP 4(a) which governs appeals in ordinary civil actions. No legal authorities or policy arguments supporting this viewpoint have ever been tendered. However, Herrmann's present counsel assumes that Herrmann had 30 days after "written notice of the entry" to appeal from Waters' order, in accord with NRAP 4(a), and had 10 days from "written notice of the entry" in which to file a motion to amend or alter Judge Waters' order, in accord with NRCP 52(b). In essence, then, it is respondent Herrmann's position that, because Flangas and Ross did not serve his former counsel with an express, formal written notice of the order Judge Waters entered on November 29, 1973  which order Judge Waters executed in open court, on a form Herrmann had personally helped to prepare, and with Herrmann present at the time of its entry  Herrmann's time to challenge the order never began to run. This stance is totally untenable.
In the case of In re Estate of Riddle, 99 Nev. 632, 634, 668 P.2d 290 (1983), this court explicitly rejected identical contentions that the notice-of-entry provisions of NRCP and NRAP should be superimposed on NRS 155.190, stating:
This is not a situation where there is a conflict between a general rule of this court and a general statute, each of which clearly applies to an appeal. See e.g., State v. Connery, 99 Nev. 342, 661 P.2d 1298 (1983). Rather, the legislature has determined that certain probate orders are appealable so long as the appeal is taken within thirty days after entry thereof... .
Moreover, even if notice-of-entry provisions could be engrafted upon NRS 155.190, the belated filing of respondent Herrmann's *608 purported "motion" could not be justified, for reasons hereinafter set forth.
3. It should be noted that in many jurisdictions, including the federal court system, written notice of entry is not required to start time running against the right to appeal or the right otherwise to attack a final order. In adapting the federal rules of procedure to Nevada practice, however, NRAP 4(a) was revised to preserve the existing Nevada law that, in a civil action, the 30-day period within which an appeal may be taken runs from the date of written notice of the entry of the judgment or order appealed from. See Advisory Committee Note, NRAP 4. Our research has not revealed any Nevada authorities that aid us in construing NRAP 4(a) in the factual circumstances of this case.[17] Hence, for assistance in assessing the correct application of our rule, we must turn to decisions from other states, where rules similar to NRAP 4(a) have been adopted.
Under similar provisions, it has frequently been held, in various contexts, that when actual notice of a written kind is established, the purpose of the rule is satisfied and no separate formal notice is required. Thus, it has been held that, where a party who attacked a judgment had previously obtained notice through receipt of a filed-stamped copy of the judgment itself, the time for appeal had commenced to run from such receipt and expired a month later. Marsh v. Utah Homes, Inc., 17 Utah 2d 248, 408 P.2d 906 (1965); in accord, Canton Concrete Products Corp. v. Alder, 273 N.W.2d 120 (S.D. 1978). Similarly, it has been determined that receipt of a writ of execution identifying the case, and referring to the court's award, constituted an adequate notice. Dustin v. Beckstrand, 103 Idaho 780, 654 P.2d 368 (1982). Again, it has been ruled that where actual notice of the judgment was established on the record, through affidavits of the very party who later attempted to appeal, the time for appeal had begun to run from the date when notice was established on the record, without a more formal written document. Cline v. Roemer, 97 Idaho 666, 551 P.2d 621 (1976); in accord, Klaudt v. Klaudt, 156 N.W.2d 72 (N.D. 1968). Even "constructive" notice of entry, derived from the fact that the parties were aware that the judgment document was in the court file and available to them, has been held sufficient. Swayne v. Otto, 99 Idaho 271, 580 P.2d 1296 (1978).
Thus, under these authorities, the time to appeal Judge Waters' order would have elapsed some 15 months before the "motion to amend or alter" was filed on April 11, 1975. It will be recalled that not only were Herrmann and his counsel present at court on the day Judge Waters' order was entered, but that his counsel, at least, received back copies of the order after it was filed. Shortly after Judge Waters' order, Flangas sent a letter to Herrmann's counsel, which referred to the Herrmann Estate proceedings and to the fact that an award of fees had been entered therein. This letter was modified by Flangas as the result of negotiations, and then filed as part of the court records by Herrmann or his counsel. On July 3, 1974, Herrmann returned to court pursuant to an order to show cause, issued because of his failure to comply with Judge Waters' order. There, the file containing Judge Waters' order was available for his inspection. Herrmann appears to have explained that his failure to pay the monies ordered by Judge Waters was due to lack of liquidity; he departed court, and afterward waited another nine months before attempting to attack Judge Waters' order.
The file before us thus demonstrates, definitely and unequivocally, that Ralph Herrmann and his former counsel had received actual notice of entry of judgment, through written documents of record, many months before the belated attack they launched on Judge Waters' order in April of 1975. Our decision need not rest on that consideration, however.
4. Instead, the narrower ground is available that it was unnecessary for Herrmann's counsel to receive further notice from Flangas and Ross in order to trigger the limitations of NRAP 4(a), and NRCP 52(b), because Judge Waters' order was entered not only in the presence of Herrmann and his former counsel, but at their *609 specific instance. Because of these facts-even though Herrmann and his counsel appear to have been immediately dissatisfied with the award to Flangas and Ross  they also were as totally aware of Judge Waters' juridical act as it was possible for them ever to be.
We think our written notice requirement simply was never intended to operate in favor of a party who has himself prepared and procured the entry of a judgment. C. & M., Inc. v. Northern Founders Insurance Co. of N.D., 124 N.W.2d 471 (N.D. 1963), was a case much like the instant one. Therein, a moving party was dissatisfied with an order which the district court had entered in ruling on such party's motion. Long afterward, the moving party attempted to appeal; the respondents moved to dismiss the appeal as untimely; and the moving party countered by contending that no written notice of entry had been served as contemplated by state law. The North Dakota Supreme Court acknowledged that, by virtue of the statute requiring written notice of entry of judgment, "[o]rdinarily the time within which an appeal may be taken from an appealable order does not commence to run until written notice shall have been given to the party appealing." Id. at 473. However, the court noted that the appellant had itself procured entry of the order, and went on to state:
This Court has held that where a moving party whose motion is denied procures a written order to be signed denying the motion, he has notice of the order, his time for appeal therefrom starts to run when the order is signed, and the order becomes final sixty days thereafter. Citizens National Bank of Northwood v. Larson, 59 N.D. 427, 230 N.W. 292. In this case the right of appeal from the order denying this appellant's motion for judgment notwithstanding the verdict expired sixty days after April 29, 1960, which was the date that the order was procured and served by the attorneys for the present appellant, Northern Securities Company. Upon the expiration of that sixty-day period, no appeal having been taken, the order denying appellant's motion for judgment notwithstanding the verdict became final as to all issues presented by the motion and such issues cannot be raised in the Supreme Court on a subsequent appeal from the judgment... .
124 N.W.2d at 473-474; in accord, Citizens' Nat. Bank v. Larson, 59 N.D. 427, 230 N.W. 292 (1930).
We agree with the North Dakota court's ruling. As the Court of Appeals of New York has noted, when the party himself causes the entry "he clearly has knowledge of the adverse order or judgment." People v. Lilly, 299 N.Y. 281, 86 N.E.2d 747, 749 (1949). It is of little moment in such a case as this whether the order submitted to and executed by Judge Waters was thereafter conveyed to the clerk's office for filing by the court clerk, or was carried there personally by Herrmann's counsel in accord with common Nevada practice. Id. at 749. The decision in the Lilly case, id., was predicated "upon the pragmatic consideration that one who necessarily knows of an event because he was an active participant need not be given formal notice of what he is bound to know." See Stern Brothers v. Livingston, 2 App.Div.2d 553, 156 N.Y.S.2d 953, 956 (1956); see also Matar v. Morton, 3 App.Div.2d 407, 161 N.Y.S.2d 186 (1957). All provisions of the NRCP are to be "construed to secure the just, speedy, and inexpensive determination of every action." NRCP 1.
Given our conclusion that Flangas and Ross were not obligated to provide respondent Herrmann with further notice of entry of judgment, we need not consider the contentions of Flangas and Ross that, in any case, Herrmann thereafter waived notice by his subsequent conduct. We note, however, that an examination of the authorities provides substantial support for such contentions.[18]
5. Before concluding, we should briefly discuss In Re Hansen's Estate, 50 Nev. 16, 248 P. 891 (1926), on which respondent Herrmann has placed substantial reliance both here and in the lower court. Respondent Herrmann would have us read the Hansen case as holding that any heir to an estate has a right to contest any order entered in the probate proceedings. *610 However, the actual holding is not so broad. This court in Hansen simply recognized that heirs whose legacies would be reduced by an award of attorneys' fees were interested in such order, and thus aggrieved thereby, and therefore were entitled to pursue a timely appeal. As hereinbefore noted, respondent Herrmann did not pursue an appeal or other timely attack on the judgment  and he is not entitled to avoid this contretemps by invoking the names of his sisters or that of his mother. The "motion" filed by respondent Herrmann's counsel on April 11, 1975, was eventually recognized by the court and the parties as respondent Herrmann's motion. No other motion or pleading attacking Judge Waters' order has ever been filed by anyone else.
Furthermore, it does not appear that Judge Waters' award of fees to Flangas and Ross would reduce the monetary gifts left by the decedent to the special legatees. Indeed, it appears that the decedent's wife and daughters, i.e. respondent Herrmann's mother and sisters, already have received the special legacies left to them in the Will. Thus, even if the special legatees had pursued an appeal, or had launched some other timely attack on Judge Waters' order, the challenge could not be sustained because they were not aggrieved. See NRAP 3A(a) (only an aggrieved party may appeal a judgment). And omitting to serve a special legatee with written notice of entry of judgment, when the judgment does not adversely affect the special legatee, neither defers the judgment's finality nor delays the time in which an appeal must be taken. In re Vaughan's Estate, 202 Cal. 672, 262 P. 305 (1927). "Failure to serve notice of a judgment, order or decree on a party not affected thereby, has no effect on the time for taking an appeal." 4A C.J.S. Appeal and Error § 447 at 126. See also Pomper v. Behnke, 97 Cal. App. 628, 276 P. 122 (1929).
6. By reason of the foregoing, it is unnecessary to review other irregularities in the proceedings before Judge McKibben, such as the fact that Judge McKibben, without notice, reassigned the burden of proof to Flangas and Ross long after the trial had ended and while the case was under submission to him.

CONCLUSION
In conclusion, we think some comment should be made about untenable suggestions, tendered by respondent Herrmann's counsel during oral argument, to the effect that Herrmann was "surprised" and "shocked" by the amount of Judge Waters' award to Flangas and Ross, and that Herrmann therefore was deprived of his day in court. "What was he to do?" asked Herrmann's counsel plaintively during an oral argument before this court. There are several irrefutable answers to this question, including some based on evidence in the record that Herrmann is not an entirely truthful man.
One indisputable response to Herrmann's claim of unfair "surprise" is that, as we have indicated, Herrmann had 30 days in which to appeal from Judge Waters' order, if indeed he or his counsel believed that established procedural safeguards had been violated by the manner of its entry. He failed to employ that remedy.
Perhaps most important, our court rules expressly allowed Herrmann six full months in which to file a motion to vacate Waters' order, if indeed he believed it had been entered through "mistake, inadvertence, surprise or excusable neglect." See NRCP 60(b). He did not pursue that remedy either, even though Judge Waters had died and the successor judge was available to consider any such timely motion.
Ralph Herrmann is no untutored rustic. He attended a good college; he had a successful career as a banker; and his testimony reflects that he is highly intelligent, articulate, and literate.[19] The record reflects that Herrmann enjoys reading law books, and that he assisted Mr. Martillaro with the legal research concerning his business matters and litigation. In fact, Herrmann even possessed his own key to Martillaro's law office, so that he could gain access to Martillaro's law library at nights and on weekends.
*611-613 It therefore seems appropriate for us to emphasize that, when the facts are analyzed, attempts to portray Ralph Herrmann as helpless, and as unfairly "surprised," appear both inaccurate and disingenuous. And, when the law is analyzed, Herrmann's sole legal contention  i.e., that omission by Flangas and Ross to serve notice of entry of judgment deferred, forever, the finality of Waters' award  is at best frivolous, if not fatuous.
Even if we were free to ignore the explicit provisions of controlling law hereinbefore mentioned, we perceive nothing inequitable to Mr. Herrmann in enforcing Judge Waters' order. Judgments must have some finality, even those entered on behalf of professional practitioners. As Abraham Lincoln often is quoted as saying: "A lawyer's time and advice are his stock in trade." The record reflects that Flangas and Ross served effectively to achieve Mr. Herrmann's purposes. For over a decade, they have received no compensation whatever for their services and expenses incurred on Herrmann's behalf. In this period, Herrmann has had the benefit of their labors. To us, these facts do not reflect a picture of unfair imposition by the lawyers upon Herrmann.
To recapitulate, then, the order Judge Waters entered on November 29, 1973, awarding fees to appellants, was duly and properly entered in proceedings that were regularly conducted in all respects. Furthermore, said proceedings and Judge Waters' order were not merely regular on their face; in addition, the ensuing investigation, and the trial before Judge McKibben, demonstrated no underlying irregularity or impropriety of any kind therein. Said investigation and trial demonstrated that Judge Waters' order was in no way insupportable, unconscionable, or contrary to available evidence.
Moreover, Judge Waters' order was final and no longer subject to challenge, by appeal or otherwise, well over 10 months prior to the date when respondent Herrmann belatedly sought to challenge said order by his purported "Motion to Amend or Alter the Order of November 29, 1973."
By virtue of the foregoing, we have necessarily concluded that Judge Waters' aforesaid order was and remains valid and enforceable, and that Judge McKibben's order, entered in derogation thereof, is therefore void.[20] Accordingly, the order appealed from must be, and hereby is, reversed.[21]
NOTES
[1] All relevant proceedings referred to herein were conducted in district court at Yerington, Nevada, the county seat of Lyon County. Lyon County was one of five counties encompassed in the First Judicial District at the time Judge Waters presided. Judge McKibben, the successor to Judge Waters' successor, was also originally appointed as a Judge of the First Judicial District. Subsequently, as of January 1, 1978, Douglas and Lyon Counties were designated to be the Ninth Judicial District, of which Judge McKibben thereafter remained the presiding judge.
[2] Ralph Herrmann was to hold the estate residue subject to a trust, as follows. Herrmann's wife Fern was entitled to receive income from the estate for life; to demand from the trust corpus up to, but not exceeding, $5,000 in any one calendar year; and if Ralph Herrmann should predecease her, to have a power of appointment and to "cause distribution to be made to [the issue of Herrmann's issue] or to them, as she shall desire." Upon Fern Herrmann's death, respondent Ralph Herrmann as trustee was to distribute the estate residue to himself.
[3] Indeed, it appears that from the time the probate commenced these had been the expectations of all concerned. Flangas and Ross not only regularly performed services primarily intended to benefit the residuary estate. In addition, the record contains testimony from Flangas that this was the understanding he reached with Martillaro before he consented to allow his appointment as attorney for the non-resident heirs. Correspondence in the record confirms that, soon after his appointment, Flangas notified the non-resident heirs of his understanding that the fees for services supplied by him would not be assessed to such heirs.
[4] Of course, the lack of concern shown by the non-resident legatees was consistent with their disinterested circumstances. It is clear that under Walter Herrmann's Will, his daughters had no substantial legal or equitable interest in the residue of the Estate, which was to be distributed to respondent Ralph Herrmann. This is true, even considering the contingency that Ralph Herrmann might possibly predecease his elderly mother, Fern. Even in such event, Fern Herrmann would not be burdened by any legal or equitable obligation to exercise, upon her own death, her power of appointment by Will in favor of any one of the daughters. Assuming Fern Herrmann survived Ralph, and also assuming one or more daughters survived Fern, Fern would still be free to designate other recipients of the residue from a class consisting not only of the daughters, but of their "issue" and of Ralph Herrmann's "issue." In short, as to the residue, Walter Herrmann's daughters had been bequeathed no direct legal or equitable interest, and their prospects of succeeding to any of the residue, based on the power of appointment contingently granted to their mother, were speculative and remote. See n. 1, supra.
[5] As this court has heretofore mentioned in deciding a related matter, we think these facts should be noted and emphasized, inasmuch as numerous stories have been generated in the news media, which have unfairly compared the amount of the fees Judge Waters awarded to Flangas and Ross with the specific bequests the decedent had made by Will to the non-resident heirs, and which have incorrectly suggested that the non-resident heirs' bequests were diminished thereby. See In re Ross, 99 Nev. 1, 656 P.2d 832 (1983); 99 Nev. ___, 668 P.2d 1089 (1983) (on rehearing).
[6] Over 11 months later, on March 26, 1975, during proceedings to be mentioned later, Herrmann's attorney attempted to suggest that Flangas' letter memorialized a binding agreement of compromise, even though Herrmann had not fulfilled its terms.
[7] The record contains substantial evidence of Herrmann's financial irresponsibility in these regards. His irresponsibility also is illustrated by a reported Nevada Supreme Court opinion entitled Sea Air Support, Inc. v. Herrmann, 96 Nev. 574, 613 P.2d 413 (1980). That case reviews Herrmann's efforts to renege on the payment of several large checks, which he had cashed at the Ormsby House Hotel and Casino, and the proceeds of which he had gambled away.
[8] One handwritten letter in the record recites as follows:
 February 12, 1974

Mr. Flangas,
I am writing you in regard to the estate of W.E. Herrmann. Please send me a letter showing the total value of my father's estate.
I would also like you to let me know why the money from the will has not been paid to the heirs.
 Thank you,
 Mrs. Mary Franklin
 Rt. 1 Box 114
 Vichy, Mo. 65580
Further correspondence in the record substantiates that Walter Herrmann's other daughters also expressed concern to Flangas regarding delay in payment of their bequests.
[9] These facts warrant special attention, in view of unfairly publicized intimations that Flangas and Ross have been avaricious and have placed their interests ahead of their clients. The record clearly does not support such comments.
[10] However, some time during or soon after this period, as has been elsewhere reviewed, the successor judge formulated certain unfounded suspicions regarding Judge Waters and counsel serving in the Herrmann Estate, which the successor judge related privately to the President of the State Bar Association. As a result, the State Bar retained an investigator, one James Sims, whose activities the successor judge privately channeled. See In re Ross, supra, n. 5.
[11] By a brief of legal "Points and Authorities" filed March 12, 1976, Flangas and Ross further demonstrated that they were not petitioning for a new award of fees; that by mentioning $210,000 as the arguable value of their services, they were not seeking such an award; and that their legal position was that the successor judge had no jurisdiction to reconsider their prior award of $70,000.
[12] Among other things, the successor judge's order was contrary to Nev. Const. art. 6, § 19, and NRS 3.040, which contemplate that only the Chief Justice may assign a judge to sit in a case outside his or her district.
[13] The significant consequence of requiring Martillaro to justify his fees, even though there existed no dispute concerning them, was to place Martillaro in a position adversary to Flangas and Ross on the subject of whose services really had most benefited the estate.
[14] In addition to the movant, Ralph Herrmann, the other parties who appeared were: the non-resident heirs, i.e. Mary Louise Franklin, Ruth Fern Estep, and Ethel May Colthern, through counsel Thomas R.C. Wilson III; John Tom Ross personally and through counsel Drake DeLanoy; Peter Flangas personally and through counsel William Marchiando. Carl Martillaro appeared later as a witness in regard to his fees. Fern Herrmann was never present, either personally or through counsel, and she had no pleadings before the court.
[15] It would seem that based on examination of the single Washington case he cited, Judge McKibben had changed his mind  after the parties had presented their respective cases at trial  about how the evidence should be sifted and weighed. It is clear, however, that the Washington decision cited by Judge McKibben does not support his revised view of his power, but instead is totally inapposite. The cited decision considers an attorney's burden of proof in the first instance; it affords no authority for Judge McKibben's action in the instant case, which involves the attempted abrogation of a final order rendered by a predecessor judge.
[16] As stated in 9 Wright & Miller, Federal Practice and Procedure 722, § 2582, "The primary purpose of Rule 52(b) is to enable the appellate court to obtain a correct understanding of the factual issues determined by the trial court as a basis for the conclusions of law and judgment entered thereon. A party who failed to prove his strongest case is not entitled to a second opportunity by moving to amend a finding of fact and a conclusion of law."

"The purpose of 52(b) is to clarify matters for the appellate court's better understanding of the basis of the decision of the trial court... . The Rule permits the Court in its discretion to `amend' findings of fact or to `make additional findings', thus amplifying and expanding the facts. The Rule does not provide for a reversal of the judgment or for a denial of the facts as found, which is what the plaintiff requests at present." Matyas v. Feddish, 4 F.R.D. 385, 386 (M.D.Pa. 1945).
Rule 52(b) merely provides a method for amplifying and expanding the lower court's findings, and is not intended as a vehicle for securing a re-hearing on the merits. Noice v. Jorgensen, 151 Colo. 459, 378 P.2d 834 (1963); Minneapolis-Honeywell Reg. Co. v. Midwestern Inst., Inc., 188 F. Supp. 248 (N.D.Ill. 1960).
[17] Kondas v. Washoe County Bank, 50 Nev. 181, 254 P. 1080 (1927), and Afriat v. Afriat, 61 Nev. 321, 117 P.2d 83 (1941), cited by respondent, are inapposite. The former merely recognizes that being present in court, when a judgment is announced, does not by itself constitute written notice of entry. The latter recognizes in general terms the need for written notice. Neither case was decided on facts like those of the instant one.
[18] See Glock v. Elges, 39 Nev. 415, 159 P. 629 (1916); Hunter v. Truckee Lodge, 14 Nev. 24 (1879); Labidee v. City of Pierre, 43 S.D. 31, 177 N.W. 499 (1920); State v. First Judicial District Court, 38 Utah 138, 110 P. 981 (1910). Where "a party dissatisfied with a judgment ... invokes the action of the court to relieve him, either wholly or in part, from the effect thereof, he will be deemed to have waived service of notice." Id. 110 P. at 982.
[19] As Mr. Herrmann extemporaneously described his career at trial:

From 1961 through 1972, I was with Western Bank Corporation. I started with First National Bank. In '61 I worked in the Auditing Department. I became Vice President and Cashier of one of our Unit Banks in Laramie, Wyoming. I became the Associate Auditor for United California Bank and worked on special assignments with Western Bank Corporation.
[20] Our decision in this matter is predicated on Nevada law as it existed in 1973, when the circumstances involved in this dispute arose. Pursuant to NRS 150.060, as it then was written, there was no provision that a petition requesting an award of fees should specify any particular dollar amount as appropriate. Rather, just as respondent Herrmann's petition did in this case, it was customary practice to pray for reasonable fees to be awarded. Our ruling herein therefore does not consider whether, under NRS 150.060 as amended, an executor could pray generally for an award of reasonable fees, submit the issue for decision, and then later attack the court's award on the ground that the executor himself had failed to comply with NRS 150.060, as amended, by designating what dollar amount he considered to be proper.
[21] Chief Justice Noel E. Manoukian is disqualified in this matter. Justice John C. Mowbray has voluntarily recused himself. Pursuant to order entered by Acting Chief Justice Springer, Senior Justice David Zenoff has been assigned to participate in the court's deliberation and determination of this matter. See: Nev. Const., art. 6, § 19(1)(a) and 19(1)(c), and SCR 10.